**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EUGENE WINKLER, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 99 C 2424** |
| | ) | |
| **v.** | ) | **Judge Blanche M. Manning** |
| | ) | |
| **CHICAGO SCHOOL REFORM** | ) | |
| **BOARD OF TRUSTEES, et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiffs, as Illinois and federal taxpayers, brought this action seeking declaratory and injunctive relief against defendants, the Chicago School Reform Board of Trustees, the Department of Defense ("DOD") and the Department of Housing and Urban Development ("HUD"). For purposes of the motions currently pending before the court, plaintiffs claim that the defendants DOD and HUD expend federal tax funds in supporting Boy Scouts of America ("BSA") Scouting programs operated by religious, government, and private organizations. According to plaintiffs, these expenditures violate the Establishment Clause of the U.S. Constitution[1] because the BSA's guidelines require all of its participants to affirm a belief in God and thus, the BSA excludes atheists and agnostics from its membership. The present matter comes before the court on cross-motions for summary judgment as to Count III of the Third

---

[1]"Congress shall make no law respecting an establishment of religion. . . ."

Amended Complaint[2], which alleges that the support provided by the DOD under four statutes and two programs promulgated by HUD violate the Establishment Clause for the reason stated above. For the following reasons, the parties' cross-motions for summary judgment are granted in part and denied in part.

## I.    Background

In these cross-motions for summary judgment, four statutes and two governmental grant programs are at issue. Plaintiffs allege that the DOD expends federal tax monies to operate Scouting pursuant to congressional expenditure programs. Specifically, plaintiffs challenge the support provided by the DOD to the BSA pursuant to 10 U.S.C. §§ 2554, 2606, 2012, and 32 U.S.C. § 508.[3] Plaintiffs also challenge two programs promulgated by HUD: the Community Development Block Grant funds ("CDBG") and the Public Housing Drug Elimination Program ("PHDEP"). These programs provide government grants to eligible recipients for expanding low and moderate-income individuals' housing and economic opportunities (CDBG) and anti-drug and anti-crime initiatives (PHDEP). Funds from each of these programs have been allocated to various boy Scouting units across the United States.

Plaintiffs allege that each of the aforementioned statutes and programs violate the First

---

[2]Plaintiffs have since amended the complaint but the amendment did not alter Count III with respect to the motions currently before the court.

[3]10 U.S.C. § 2554 authorizes the DOD to provide services and supplies in connection with national and world Boy Scout Jamborees. 10 U.S.C. § 2606 authorizes the DOD to assist certain scouting organizations in establishing and providing facilities and services for members of the Armed Forces and their families. 10 U.S.C. § 2012 authorizes the DOD to provide services, equipment, transportation, facilities, and supplies to various outside organizations, including the BSA. Finally, 32 U.S.C. § 508 authorizes the National Guard to provide the same services to the same organizations as those authorized by 10 U.S.C. § 2012.

Amendment's Establishment Clause because they expend federal tax monies on Scouting units which limit participation on the basis of religious belief. Therefore, they seek declaratory judgment and injunctive relief against the DOD and HUD for acting pursuant to an unconstitutional grant of power from Congress. Specifically, the plaintiffs request that this court issue a judgment declaring that the DOD and HUD have violated the Establishment Clause by expending federal tax funds in support of the BSA and issue a permanent injunction enjoining the DOD and HUD from expending tax funds to the BSA.

Because they are relevant to the case at hand, the court will provide a brief background on the BSA, its Jamboree and the two challenged HUD programs (CDBG and PHDEP).[4]

*Department of Defense–Boy Scouts of America and the Jamboree*

The BSA was founded in 1910 and is a private, non-profit organization. The U.S. Congress granted the BSA a federal charter in 1916 and stated in the charter that the purpose of the BSA was to "promote. . . the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred values." Today, over 3 million youth and over 1 million adult volunteers participate in Scouting. Scouting is divided into three membership programs for youth in different age groups: Cub

---

[4] Throughout its response to HUD's Statement of Facts, plaintiffs respond to certain statements as "immaterial" and provide no factual basis in the record that the statement is inaccurate. Rather, plaintiffs often essentially dispute the relevance of the statement. This is not an acceptable response to a Statement of Material Fact submitted under Local Rule 56; accordingly, this court will deem such statements admitted. Further, to the extent that plaintiffs reference or incorporate pleadings and legal arguments from other briefs in other cases, these referrals and incorporations will not be considered as undisputed statements of fact by this court. As defendants note, the other cases involve different claims, different issues, different parties and different jurisdictions and thus have no preclusive effect. The court will consider only those properly admitted facts adduced in this action. Finally, while the court may take judicial notice of decisions by other courts in other jurisdictions, these cases are not controlling.

Scouting for boys in first through fifth grade or who are seven to ten years old; Boy Scouting for boys who have completed the fifth grade or who are eleven to seventeen years old; and Venturing; a program specializing in high adventure and sports, for young men and women who are 14 to 20 years old.  The Scout Oath, which all Boy Scouts must know and subscribe to, states that:

> On my honor I will do my best
> To do my duty to God and my Country and to obey the Scout Law;
> To help other people at all times:
> To keep myself physically strong, mentally awake and morally straight.

Further, the BSA Declaration of Religious Principle provides that:

> The Boy Scouts of America maintain that no member can grow into the best kind of citizen without recognizing an obligation to God.  In the first part of the Scout Oath or promise the member declares, "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law."  The recognition of God as the ruling and leading power in the universe and the grateful acknowledgment of his favors and blessings are necessary to the best type of citizenship and are wholesome precepts in the education of the growing members.  No matter what the religious faith of the members may be, this fundamental need of good citizenship should be kept before them.  The Boy Scouts of America, therefore, recognizes the religious element in the training of the member, but it is absolutely non-sectarian in its attitude toward that religious training.  Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life.

The BSA excludes atheists and agnostics from youth membership and adult leadership and the BSA describes the "duty to God" component of the Boy Scout Oath as "the bedrock of Scouting's values."  In addition, the Scout Law provides that "a Scout is Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Brave, Clean, and Reverent." The BSA encourages its youth members to practice their religious beliefs as directed by their parents and religious and spiritual advisers.

The BSA hold a National Scout Jamboree ("NSJ") in the United States every four years.

The NSJ is a large gathering of Boy Scouts in which Scouts from many different troops come together to share in Scouting activities and celebrate Scout values. Since the first NSJ was held in 1937, the military has loaned equipment and provided various services in support of the event. Recognizing this tradition, in 1972, Congress provided permanent authority for the support by enacting 10 U.S.C. § 2554, *see* S. Rep. No. 92-631 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2022, 2023-24, one of the challenged statutes.

The NSJ has traditionally been held on public lands, such as national and state parks or land reserves. Since 1981, the NSJ has been held on a section of Fort A.P. Hill in Virginia, a 76,000-acre area of land used by DOD for military training purposes throughout the year. The 2001 NSJ was attended by approximately 40,000 Scouts and Scout leaders and 250,000 visitors from the general public and across the world. For ten days, Scouts attend the NSJ camp together and spend the bulk of their time in activities emphasizing physical activities and appreciation of the outdoors such as archery, air-rifle shooting, bicycle courses, buckskin games, obstacle courses, trap shooting, fishing, snorkeling, canoeing, rafting, kayaking and sailing.

At the NSJ, Scouts also spend their time learning new skills and earning merit badges in such areas as art, mammal study, wood carving, fire safety and lifesaving. Typically included at the NSJ are a diverse collection of cultural and educational exhibits for Scouts to visit. Further, patriotism is a major theme of the NSJ and many political and military leaders, including the President of the United States, visit the NSJ to address the Scouts.

In addition to the secular activities, the BSA makes religious services of a wide variety of denominations available to those who wish to participate. For example, at the 2001 Jamboree, the Apostolic Nuncio to the United States (i.e., the ambassador from the Vatican) celebrated

mass for Roman Catholic Scouts and visitors. Further, at the 2001 Jamboree, 110 chaplains were present, and the BSA estimated that 98% of the Jamboree participants attended a religious service, but anyone who attended did so voluntarily.

The cost of providing support for the NSJ varies from year to year, but for the previous two NSJs in 1997 and 2001, the DOD spent approximately $6 million and $8 million, respectively, on the Jamboree. These funds were used to pay for services provided in support of the event itself, but also for the costs of transporting and billeting the large influx of soldiers brought to Fort A.P. Hill to perform services during the event. Some of the DOD's spending of appropriated funds for the Jamborees is for the purchase of various goods. For example, in 2001, the DOD spent $8,000 to purchase flags, $5,000 to rent a hot air balloon bearing the word "Army" and $160,000 to rent commercial vehicles such as forklifts and trucks. In 1997, the DOD spent $150,000 to purchase general medical supplies, more than $13,000 to purchase pediatric medical supplies, and $468,000 to restore sites and to repair and return all borrowed vehicles and equipment to their proper owners after the NSJ was over.

In addition, some of the DOD's appropriated funds were used for an Army Adventure Area where Scouts could learn about the Army by interacting with soldiers and participating in various activities. At the 2001 Jamboree, DOD spending on the Army Adventure Area amounted to approximately $211,000.

Some of the appropriated funds have also been used to support Scouts earning merit badges, for military performing units, for publicity of DOD's support of the Jamboree, for travel of DOD personnel, and for transportation of equipment. None of the funds spent by the DOD are given directly to the Scouts as cash; rather, all support provided by the DOD is in-kind

support as described above.  Pursuant to the authorization in 10 U.S.C. § 2554, the DOD has budgeted and expects to spend approximately $7.3 million of appropriated funds to support the 2005 Jamboree, $3.6 million of which is for the purchase of various goods.

*Community Development Block Grant Program (CDBG)*

Plaintiffs also challenge two federal grant programs implemented by HUD because these programs have distributed money to grantees who have, in turn, provided cash grants to the BSA.  The Community Development Block Grant ("CDBG") Program is authorized by Title I of the Housing and Community Development Act of 1974 ("HCDA"), as amended 42 U.S.C. § 5301, et seq.  Pursuant to this program, HUD awards CDBG funds on an annual basis to states and entitled metropolitan cities and urban counties ("grantees").  CDBG grantees may then award subgrants to other grantees.

The primary objective of Title I of the HCDA is the development of viable urban communities by providing decent housing and a suitable living environment, and by expanding economic opportunities, principally for low and moderate-income individuals.  The CDBG awards annual grants on a formula basis to implement a wide variety of community and economic development activities directed toward neighborhood revitalization, economic development and the provision of improved community services and facilities.

Since its first year of implementation in 1975, CDBG funds have been awarded to numerous grantees through several programs.  These programs include Entitlement Communities, State-administered CDBG, HUD-administered Small Cities, Insular Areas, Disaster Recovery Assistance, and Colonias.  Grants to Boy Scout troops were awarded under the Entitlement Communities Program by entitled metropolitan cities and urban counties.

CDBG funds may be used for certain specified activities, such as acquisition, construction, reconstruction, rehabilitation of public works and facilities; acquisition, reconstruction, and rehabilitation of privately-owned property, code enforcement, demolition, and clearance; increased level of public services, including but not limited to those concerned with employment, crime prevention, child care, health, drug abuse, education, fair housing counseling, energy conservation, and welfare; relocation payments; certain economic development; homeownership assistance; and planning and administrative costs, among others. 24 CFR §§ 570.201-206.

CDBG activities undertaken by a grantee must each meet one of the following "national objectives" of benefit to low or moderate income families or aid in the prevention or elimination of slums or blight or activities which the recipient certifies are designed to meet other community development needs having a particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community where other financial resources are not available to meet such needs. 24 CFR 570.200(a)(2). The CDBG program provides annual grants on a formula basis to entitled metropolitan cities and urban counties (generally, cities with a population of 50,000 or more, or principal cities of Metropolitan Statistical Areas, and counties with a population of 200,000 or more, excluding metropolitan cities located therein) to implement. Each entitled metropolitan city and urban county is eligible to receive CDBG block grants, so long as it submits a Consolidated Plan in which it identifies its goal for a three to five-year period, an Annual Action Plan, in which it identifies its planned uses for funds and applies for funding, and submits the required certifications. 24 C.F.R. 570.302 and 570.304.

*Public Housing Drug Elimination Program* (PHDEP)

Pursuant to the PHDEP program authorized by Congress in 42 U.S.C. § 11902, HUD awards PHDEP funds to public housing authorities. The Anti-Drug Act of 1988 (as amended by Section 5143) and an amendment to the U.S. Housing Act of 1937 authorizes HUD, Office of Public and Indian Housing ("PIH"), to establish and maintain clearinghouse services that support, track and market anti-drug and crime reduction initiatives in Public and Indian Housing as well as to provide technical support to enhance the performance of housing entities receiving funding through PHDEP. Public Housing Agencies ("PHAs"), Native American Tribes, tribally Designated Housing Entities, Resident Management Corporations ("RMCs"), Resident Councils, and Resident Organizations are eligible to receive PHDEP funds.

The PHDEP program provided competitive grants to support seven specific activities in fighting drugs and related criminal activities in and around public and assisted housing: employment of security guard personnel; reimbursement of local law enforcement agencies for additional security and protective services; physical improvements to enhance security; employment of individuals to investigate drug-related crime; establishment of voluntary tenant patrols; innovative programs to prevent and reduce drug-related crime and violence; and programs for drug prevention, intervention, treatment and structured aftercare. Eligible applicants received funding based on whether they fell into one of the specified needs categories, which were based on FBI crime statistics and statistics for housing agencies that have violent crime, and whether they submitted a plan to HUD for addressing the problem of drug-related and violent crime in and around housing covered by the plan.

Since 1989, HUD has awarded approximately 2500 PHDEP grants to PHAs and RMCs.

PHAs in turn sub-granted or contracted for HUD-approved services. Grantees awarded sub-grants and contracts based on need and ability. PHA could enter into partnerships with community organizations to deliver PHDEP activities. The purpose of the PHDEP program was to eliminate drug-related violent crime and problems associated with it in and around the premises of federally-assisted low-income housing, and public and Indian housing developments.

PHAs submitted applications annually for PHDEP grants. PHDEP grants were awarded competitively until FY 1998. From FY 1999 forward, grants were determined by a formula based on the applicant's share of the total number of public housing units of all eligible applicants.

When grants were determined competitively, PHDEP applications were reviewed against five criteria: extent of drug-related problems in and around public or Tribal housing communities; quality of the plan to address drug-related problems and the method of evaluating the plan's success; capability of the applicant to carry out the plan; extent to which local residents, local government, and the local community support and participate in designing and implementing proposed activities; and the extent to which the applicant coordinates its activities with other organizations and promotes participation in a community's Consolidated Planning process. HUD would assign points to each of the factors, rank the applicants based on their scores and HUD would fund the highest-ranking applicants and continued funding applications until all funds were exhausted.

PHAs in approximately fifteen states obligated PHDEP funds to Boy Scout troops. From 1996 through 2003, PHAs obligated a total of $305,941 to Boy Scout troops: 1996 ($61,103);

1997 ($6,509); 1998 ($63,614); 1999 ($33,361); 2000 ($112,864); 2001 ($18,202); 2002 ($10,078); 2003 ($210).

## II.     Summary Judgment Standard

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This court must evaluate the evidence supporting the summary judgment motion in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.     Standing

*Standing Anaylsis*

Plaintiffs bring suit as federal taxpayers. The DOD contends that plaintiffs lack standing to sue as federal taxpayers because the statutes they attack as unconstitutional do not arise from Congress' powers under Article I, § 8 of the Constitution, the tax and spend clause. They argue that taxpayer standing is only conferred on those who challenge congressional expenditure programs enacted pursuant to the tax and spend clause. Plaintiffs counter that the statutes identified in their complaint are indeed congressional expenditure programs arising from Congress' powers to tax and spend.

Generally, prospective litigants do not have standing solely based on their status as federal taxpayers. *Frothingham v. Mellon*, 262 U.S. 447 (1923). However, in *Flast v. Cohen*,

392 U.S. 83 (1968), the Supreme Court created an exception to *Frothingham* and ruled that, in certain circumstances, a federal taxpayer does have the requisite stake in the outcome of prospective litigation to gain standing. To establish the necessary stake for standing, a federal taxpayer must meet two requirements. *Id.* at 102. First, the taxpayer must demonstrate a nexus between the status as a taxpayer and the legislative enactment at issue. *Id.* at 103. It is not sufficient for a taxpayer to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. Thus, under the first *Flast* prong, the taxpayer must allege that the specific congressional expenditure program violates the taxing and spending clause. *Id.*; *See In re United States Catholic Conference*, 885 F.2d 1020, 1028 (2nd Cir.1989).

As for the second part of the *Flast* test, a taxpayer must establish a nexus between the status as a taxpayer and the precise nature of the constitutional infringement alleged. *Flast*, 392 U.S. at 103. To do this, the "taxpayer must show that the challenged enactment exceeds specific constitutional limitation imposed on the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I., § 8." *Id.* at 102-03. The taxpayers in *Flast* asserted that a violation of the Establishment Clause satisfies the second prong and the Supreme Court agreed, stating that one of the "specific evils feared" by the framers of the Constitution was that the taxing and spending power would be used to favor one religion over another. *Id.*

In the instant case, given that plaintiffs' challenges are pursuant to the Establishment Clause and thus satisfy *Flast*'s second prong, the standing analysis in the instant case with respect to the DOD statutes turns on the first prong of the *Flast* test, *i.e.*, whether those statutes were enacted pursuant to Congress' taxing and spending powers.

Defendant DOD argues that the four statutes as to the DOD support of the Boy Scouts, 10 U.S.C. §§2554, 2606, and 2012, and 32 U.S.C. §508, were not passed pursuant to Congress' general taxing and spending powers for the general welfare but "rather derive from Congress's direct legislative powers over the military and state militia and over federal property." In contrast, plaintiffs contend that even if Congress enacted the DOD statutes at issue pursuant to other constitutional grants of authority, the enactments were, in part, an exercise of Congress' authority under the taxing and spending clause, and thus, standing exists under *Flast*.

According to the citations by the parties, two lines of cases have emerged in support of each of the above positions. The DOD relies primarily on *Richardson v. Kennedy*, 313 F. Supp. 1282, 1286 (D. Pa. 1970), in which the court addressed a challenge to congressional salaries and concluded that the plaintiffs lacked standing because "Congress need not draw authority from [the taxing and spending Clause] if another constitutional provision confers the power to spend for a specific purpose." The *Richardson* court held that because the constitutional authority for the payment of congressional salaries stemmed from the compensation clause, Art. I, §6, plaintiffs lacked standing under *Flast*. The *Richardson* court based its decision on *United States v. Butler*, 297 U.S. 1, 65 (1936), in which the Supreme Court addressed whether the taxing and spending clause conferred a power "separate and apart from those elsewhere enumerated" or whether the phraseology of Article I, section 8, clause 1 (the taxing and spending clause), "to lay and collect taxes . . . to pay the debts and provide for the common defense and general welfare," amounted to no more than a reference to the other enumerated powers. The *Butler* court decided that the former was the proper construction of Art. I., §8, cl.1. In interpreting *Butler*, the *Richardson* court found that "[i]mplicit in [] [the *Butler*] decision that the taxing and spending

13

clause conferred a power separate and distinct from other enumerated Congressional powers was a recognition that Congress need not draw authority from this clause if another constitutional provision confers the power to spend for a specific purpose." *Richardson*, 313 F. Supp. at 1285.[5]

The Third and Tenth Circuits have followed this reasoning and denied standing when the court determined that the plaintiff-taxpayers were not making challenges to statutes enacted *solely* under the taxing and spending clause. See *Phelps v. Reagan*, 812 F.2d 1293, 1294 (10th Cir. 1987) (rejecting taxpayer standing as to Establishment Clause challenge of appointment of an ambassador stating that the "appropriations challenged here do not deal with the general welfare and are not solely dependent upon the taxing and spending clause" and noting that appointment of an ambassador was an Executive Branch decision that could not be reviewed by the court); *Americans United for Separation of Church & State v. Reagan*, 786 F.2d 194, 199 (3d Cir. 1986) (in an action seeking injunctive relief under the First Amendment against congressional actions "consenting to the appointment of and funding for a diplomatic mission to the Vatican," concluding that plaintiffs lacked standing because they did not "challenge an expenditure for which authority is found *only* in article I, section 8, clause 1 [taxing and spending clause].") (emphasis added); *Velvel v. Nixon*, 415 F.2d 236, 239 (10th Cir. 1969) (denying standing to plaintiffs seeking to challenge Vietnam War expenditures because they were exercises of Congress' military powers "to raise and support Armies" and "to provide and maintain a Navy," and were not "exercises of power to spend for the general welfare").

---

[5]The court does not agree with the DOD's contention that it is bound by the decision in *Richardson* because it was summarily affirmed by the Supreme Court. As noted by plaintiffs, a summary affirmance affirms the "'judgment but not necessarily the reasoning by which it was reached.'" *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (citation omitted).

Alternatively, the district court of New York and the District of Columbia have found taxpayer standing to exist when the taxing and spending clause is implicated, even if only in part. *Newdow v. Eagen*, 309 F. Supp. 2d 29, 38-39 (D.D.C. 2004) (concluding that the plaintiff-taxpayer had standing to bring an Establishment Clause challenge to Congress' payment of legislative chaplains' salaries because the enactments that authorized payment for congressional chaplains was "at least *in part* an exercise of Congress' authority under the taxing and spending clause") (emphasis added); *Jewish War Veterans v. U.S.*, 695 F. Supp. 3, 10-11 (D.D.C. 1988) (finding standing to challenge on Establishment Clause grounds DOD spending on a 65-foot Latin cross that served as a war memorial at a U.S. Marine Corps base in Hawaii because, in addition to citizen standing, the case represented a "classic case of taxpayer standing to challenge a congressional exercise of the taxing and spending power in violation of the Establishment Clause."); *Katcoff v. Marsh*, 582 F. Supp. 463, 471 (E.D.N.Y. 1984)*, aff'd,* 755 F.2d 223 (2d Cir. 1985) (concluding that taxpayer standing existed to challenge on Establishment Clause grounds DOD spending for the military chaplaincy program and noting that while "there is no litmus test to determine which power Congress exercises in enacting a given statute," the chaplaincy program at issue involved congressional spending).

This court is persuaded by the positions taken by the district courts in the District of Columbia and New York. The DOD does not argue, and the court has not located any express restriction in *Flast*, that Congress need to have been acting *only* pursuant to the taxing and spending clause in order for standing to exist. Indeed, in the Supreme Court cases in which standing was denied, it was clear that Congress was acting pursuant to some provision other than the taxing and spending clause (i.e., Congress could not have been acting pursuant to the taxing

and spending clause).  *Valley Forge v. Americans United For Separation of Church and State*, 454 U.S. 464 (1982) (denying standing in Establishment Clause challenge to the transfer of government property to a religious college because the transfer was authorized under the property clause); *U.S. v. Richardson*, 418 U.S. 166 (1974) (rejecting standing where plaintiffs challenge was "not addressed to the taxing or spending power, but to the statutes regulating the CIA" and regulatory statutes cannot confer standing under *Flast*); *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, (1974) (denying standing where plaintiffs "did not challenge an enactment under Art. I, s 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their reserve status").  Indeed, even the *Richardson* decision from the District Court of Pennsylvania relied upon by DOD specifically states that "we construe such [congressional] authority [to enact the statute] to be *completely independent* of the taxing and spending clause."  *Richardson*, 313 F. Supp. at 1286 (emphasis added).

With the above discussion in mind, the court will address standing as to each of the DOD statutes.  (1) **10 U.S.C. § 2554 (the "Jamboree" statute)** authorizes the DOD to "lend . . . such cots, blankets, commissary equipment, flags, refrigerators, and other equipment [,] and [,] without reimbursement, furnish services and expendable medical supplies, as may be necessary or useful to the extent that items are in stock and items or services are available" to the NSJ.  The statute further allows the Secretary of Defense to provide "without expense to the United States government," transportation from the United States or military commands overseas to Boy Scouts and representatives of Boy Scouts to any national or world Boy Scout Jamboree, including equipment.  Further, if the Boy Scout Jamboree is held on a military installation, 10 U.S.C. § 2554(g) allows the Secretary of Defense to provide personnel services and logistical

support at the military installation.  Finally, subsection (h) authorizes other departments of the federal government to provide equipment and other services under the same conditions and restrictions as prescribed for the Secretary of Defense.

As to the Jamboree statute, the DOD insists that Congress did not rely on the taxing and spending clause, but rather Congress' powers under the property clause, Art. IV, § 3, cl.2, and the military clauses, Art. I, § 8, cls. 12-14, and that "the military is a vast enterprise whose functions include public relations, recruiting and training, all of which are implicated by DOD support to the Jamboree."  Thus, DOD asks this court to follow the Third and Tenth Circuits and conclude that because Congress did not act solely pursuant to its taxing and spending power in passing the Jamboree statute, taxpayer standing must be denied.  As an initial matter, the court acknowledges that attempting to determine under what constitutional authority congress was acting in enacting a statute is not necessarily a straightforward task.  *See Katcoff v. Marsh,* 582 F. Supp. 463, 471 (E.D.N.Y. 1984) ("a federal court should not attempt to divine whether a particular statute authorizing spending is enacted under the Taxing and Spending Clause, or under some other, arguably appropriate, source of Congressional power.")

However, this court is not persuaded by DOD's arguments as to the Jamboree statute. Specifically, this court finds it telling that 10 U.S.C. § 2554(h) allows federal agencies *other* than the DOD to assist with the Jamboree as provided in the statute.  10 U.S.C. § 2554(f).  This provision indicates to the court that the purported military recruiting or training were not implicated in the statute.  Indeed, neither the statute itself nor the senate report introducing the bill, S. Rep. 92-631 (1972) *reprinted in* 1972 U.S.C.C.A.N. 2022, make reference to the recruiting or training purposes of the bill.  In fact, the Senate Report refers to the long-standing

support provided by the military as the reason for its enactment. *Id.* at 2024 ("It has been traditional for the government to assist the Boy Scouts of America with their national and international jamborees."). Accordingly, it is not at all clear to this court that the military clauses provided the congressional authorization for the Jamboree statute. Further, as noted by the district court in *Katcoff*, the taxing and spending clause states that one of the purposes for such taxing and spending will be for the "common Defence." *Katcoff*, 582 F. Supp. at 471. Thus, in enacting the Jamboree statute Congress could have been acting pursuant to the taxing and spending clause and not the military clauses. While the DOD argues that even if an expenditure is made pursuant to Congress' powers under the taxing and spending clause, it must be made for purposes of the "general welfare" and not the "common defense" in order to allow taxpayer standing, *Flast* makes no such express restriction. Accordingly, this court finds that taxpayer standing exists as to the Jamboree statute.

(2) **10 U.S.C. § 2606 (the "Overseas" statute)** authorizes the Secretary to assist "qualified scouting organizations" in "establishing and providing facilities and services for members of the armed forces and their dependents" at locations outside the United States. The following support may be provided without charge: transportation, office space, warehousing, utilities and a means of communication. The statute authorizes this support "only if the President determines that such cooperation and assistance is necessary in the interest of the morale, welfare, and recreation of members of the armed forces." ¶2606(b). Pursuant to this section, the President made such a determination and issued Executive Order No. 12715 (May 3, 1990, 55 F.R. 19051).

From 1996 to 2003, the DOD spent $1,075,946 of appropriated funds pursuant to 10

U.S.C. §2606 to support the BSA within the U.S. Europe Command ("EUCOM") and the U.S. Pacific Command ("PACOM"). The funds were spent on such things as utilities for buildings, manpower, supplies, transportation, office rent, building maintenance, telephones, renovations for a building used as a Boy Scout den, travel for Boy Scouts personnel to and from the United States, and the provision of tents and sanitation services to an annual Boy Scout summer camp. Within EUCOM, assistance is provided to the Boy Scouts and Girl Scouts by the Installation Management Agency, Europe region (IMA-E). All support is in-kind with no direct cash grants. The support provided by the DOD pursuant to this statute is a supplement to a variety of other youth programs provided by the military on overseas installations. From 1996 through 2003, DOD installations in Japan hosted an annual Boy Scouts "Scout-O-Rama" on which the DOD spent an unspecified amount pursuant to 10 U.S.C. §2606. The support included use of athletic fields, camping areas, latrines, electricity, water, and showers.

The DOD contends that the fact that the Oversea statute authorizes assistance only as deemed by the President to be "necessary in the interest of the morale, welfare, and recreation of the armed forces" dictates that the statute is "patently based on Congress' constitutional powers to regulate the military and state militia under Art. I., §8, cl. 16." This court agrees that plaintiffs lack taxpayer standing but for a different reason. Only congressional actions may be challenged under Flast. *Flast,* 392 U.S. at 106 ("we hold that a taxpayer will have standing consistent with Article II to invoke federal judicial power when he alleges that *congressional action* under the taxing and spending clause is in derogation of these constitutional provisions which operate to restrict the exercise of the taxing and spending power.") (emphasis added). Because the statute authorizes assistance only as deemed necessary by the President, plaintiffs are in essence

challenging an executive branch decision, rather than a congressional action; thus, they lack standing. *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208 (1974) (denying standing where plaintiffs challenged the executive branch's decision–not Congress'–to allow legislators to maintain military reserve status).

(3) **10 U.S.C. § 2012 (Innovative Readiness Training "IRT" statute)** and (4) **32 U.S.C. § 508 ("National Guard" statute)** will be addressed together because of their similar content. The IRT statute authorizes the Secretary of Defense to allow "units or individual members of the armed forces. . . to provide support and services to [specified] non-[DOD] organizations and activities . . . but only if . . . the provision of such assistance is incidental to military training." 10 U.S.C. 2012(a). The statute authorizes assistance to be provided to any federal, regional, state or local governmental entity including thirteen specific youth or charitable organizations such as the Boy Scouts and other entities approved by the Secretary on a case-by-case basis.

DOD implements this statute through its Innovative Readiness Training ("IRT") program. DOD spends congressionally appropriated funds on IRT projects in two ways: first, the military services performing the IRT projects may pay for all or part of the costs out of their own budgets; and second, the Office of the Secretary of Defense for Reserve Affairs ("OASD/RA"), the entity in which DOD has centralized the funding and control of IRT activities, out of its own budget, may supplement payment of the costs of any project. Congress has authorized the DOD to provide support and services to non-DOD organizations if such assistance is incidental to military training. Examples of this activity include constructing roads and buildings and transporting equipment.

It is unclear from the record the dollar amount spent by the DOD on the BSA under the

20

IRT program.  However, it appears that the parties agree that it was at least $300,000 for the period from 1996-2003.[6]  Similarly, the National Guard statute authorizes units of the National Guard to provide the same type of support to youth and charitable organizations that 10 U.S.C § 2012 authorizes the DOD to provide.

As indicated by the text of the statutes, the IRT and National Guard statutes allow the DOD to provide assistance to non-DOD organizations where it "will accomplish valid unit training requirements."  Again, DOD argues that because these statutes were promulgated under the authority of the military clauses, the taxing and spending clause could not have been implicated.[7]  The court agrees that the military training purposes behind these statutes are apparent given the express requirement that the assistance will accomplish "valid unit training

---

[6]In Plaintiff's Statement of Additional Facts (¶4) and the defendants' response, the parties disagree as to the "amount that the DOD's OASD/RA approved between 1996 and 2003 for specific IRT projects on BSA properties" as either $300,404 or $381,594.  However, in Plaintiff's initial Statement of Material Fact, plaintiffs assert that "[p]ursuant to 10 U.S.C. § 2012 and 32 U.S.C. § 508, the DOD between 1998 and 2003 spent $810,434 of congressionally appropriated funds on IRT projects that directly benefitted the BSA" while DOD responds that "f[]rom 1998 to 2003, approximately $791,657 of DOD IRT funds was spent on training costs associated with IRT projects involving BSA."  It is not clear to the court the substantive difference, if any, between the two sets of amounts, but it appears that the parties agree that the amount was at least $300,000.

[7]DOD argues in a footnote that plaintiffs lack standing as to 32 U.S.C. § 508 because "[s]ection 508 authorizes National Guard members and units, not DOD, to provide services to BSA . . . [and] [a]ny training conducted by National Guard units is conducted by the *states*." Rumsfeld Memorandum of Law, at 13 n.6 (emphasis in original).  As an initial matter, this court generally does not recognize arguments made in footnotes. *Kempf v. Mitsui Plastics, Inc.*, No. 95 C 4258, 1996 WL 1996 WL 31179 (N.D.Ill. January 25, 1996).  However, even upon consideration of the merits, the court rejects this argument given that it is undisputed that the DOD regulates all training of the National Guard, Congress annually provides funds for the National Guard as part of its annual appropriation of funds for the DOD and Congress provides virtually all of the funding for the National Guard.  Thus, the court finds that plaintiffs' injury is "fairly trace[able] to the challenged action of defendant." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

requirements."  Indeed, at least one commentator has noted that the IRT program was implemented in response to criticisms to its predecessor program, the Civil-Military Cooperative Action Program (CMCAP), which did not contain the military training requirement.  W. Kent Davis, "Innovative Readiness Training Under 10 U.S.C. § 2012: Understanding the Congressional Model for Civil-Military Projects," *Army Lawyer* (July 2001) ("The biggest change from the CMCAP to the IRT program was a new requirement that any civil-military project must first and foremost involve a strong relationship to military training").  While the court finds this to be a closer call than the Jamboree, it is not apparent to this court that Congress was not acting pursuant to the taxing and spending clause in enacting these statutes for the same reasons stated above.

The court concludes that plaintiffs possess standing to challenge the Jamboree and IRT and National Guard statutes, but not the Overseas Scouting statute.

*HUD Programs*

As to HUD, plaintiffs assert, and HUD does not challenge, that plaintiffs have standing to assert that the HUD programs at issue, CDBG and PHDEP, violate the Establishment Clause as applied.  The court agrees that the CDBG program was promulgated  under statutes authorized by the taxing and spending clause, and thus, plaintiffs possess standing to assert the challenges at issue.

However, as to the PHDEP program, HUD argues that plaintiffs' Establishment Clause challenge to the PHDEP program is moot because the program is no longer being implemented. Pursuant to Article III of the Constitution, cases that do not involve "actual, ongoing controversies" are moot and must be dismissed for lack of jurisdiction.  *Federation of*

*Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (quoting *Stotts v. Cmty. Unit School Dist. No. 1*, 230 F.3d 989,990-91 (7th Cir. 2000)). "Mootness is often described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485 (7th Cir. 2004) (citations omitted). A change in circumstances after the filing of the lawsuit, such as the repeal of the challenged statute, may moot a claim. *E.g., Federation*, 326 F.3d at 929. HUD asserts that because Congress ceased funding the PHDEP in the FY2002 HUD/VA Appropriations Act and the PHDEP program is no longer in existence, Plaintiffs' challenge to this program is moot.

In response, plaintiffs direct the court's attention to *Friends of the Earth , Inc. v. Laidlaw Envtl. Serv., Inc*., 528 U.S. 167, 189 (2000), which holds that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Plaintiffs further point out, and correctly so, that voluntary cessation moots a claim only "where there is no reasonable expectation that the [conduct] will be repeated." *Id*. (quoting *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988)). The Seventh Circuit, along with all other circuits, has "interpreted Supreme Court precedent to support the rule that repeal of a contested ordinance moots a plaintiff's injunction request, absent evidence that the City plans to or already has reenacted the challenged law or one substantially similar." 326 F.3d at 930-31 (gathering cases). Plaintiffs argue that because 42 U.S.C. § 11902, which authorized the PHDEP program, has not been repealed or modified, and Congress merely merged its annual PHDEP appropriation into its annual general public housing operating account, HUD may continue to award funds to the BSA pursuant to 42 U.S.C. § 11902. Plaintiffs also characterize

23

the changes to the PHDEP financing as a "modest adjustment to the path of the PHDEP revenue stream, and conclude that as such, it does not moot their challenge to the PHDEP statute. Essentially, Plaintiffs argue that while funding for the PHDEP program has been terminated, the alleged wrong continues as HUD may award funds to the BSA from its general operating account rather than through the PHDEP program.

Defendants counter by arguing that courts generally presume that the government is acting in good faith when it repeals a statute that is being challenged on constitutional grounds, and thus, unless there is evidence indicting that the challenged law will be reenacted, courts will find that a statute's repeal moots the challenge. *Federation*, 326 F.3d at 931. While this is true, this court finds that the current case is distinguishable from *Federation* and the cases cited therein. In the instant case, although funding has ceased to the PHDEP program, it appears that Congress has authorized continued disbursements to the same grantees based on the same criteria as provided in the PHDEP. Thus, this court finds that the case is not moot as to the PHDEP claims.

However, our conclusion that the claim is not moot runs plaintiffs directly into a standing problem. Specifically, as described above with respect to Plaintiffs' challenge of the DOD funding of the BSA, in order to have standing, federal taxpayers must challenge a specific federal expenditure program. *See Winkler v. Chicago School Reform Board of Trustees*, 2000 WL 44126, at 6-7 (N.D. Ill. Jan. 11, 2000) (granting defendant's motion to dismiss because "even though the complaint alleges that Congress has exceeded its taxing and spending powers by providing funds to support the BSA Scouting units, Plaintiffs do not direct the court to a specific congressional expenditure program, as it must, in order for federal taxpayer standing to

be appropriate").  Because the PHDEP program is no longer in operation, plaintiffs have failed

to identify a specific program they are challenging.  Accordingly, plaintiffs lack standing to

pursue claims based on the PHDEP.

In conclusion, this court finds that plaintiffs have standing to challenge the Jamboree

statute, the IRT and National Guard statutes, and the CDBG program, but not the Overseas

statute or the PHDEP program.

## IV.    Merits

The court will first outline the analytical framework for Establishment Clause challenges,

including a brief discussion of the plurality and concurring opinions in the Supreme Court's

relatively recent decision in *Mitchell v. Helms*, 530 U.S. 793, 808 (2000).  However, prior to

analyzing the statutes and programs at issue, the court will address plaintiff's argument that all

aid to the BSA is unconstitutional because the BSA is "pervasively sectarian" under

Establishment Clause jurisprudence, as described below.

### A.    Background

The Establishment Clause of the First Amendment provides that "Congress shall make no

law respecting an establishment of religion..." U.S. const. amend. I., cl. I.  This clause "prevents

the government from promoting or affiliating with any religious doctrine or organization."

*Freedom from Religion Foundation v. Bugher*, 249 F.3d 606, 610 (7th Cir. 2001)(citing *County of

Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 590 (1989)).

The Supreme Court has formulated a two-part test to determine whether a statute

complies with the Establishment Clause.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971).   A

statute does not violate the Establishment Clause under the *Lemon* test if (1) it has a secular

legislative purpose, and (2) its principal or primary effect must be one that neither advances nor inhibits religion.[8]  As to the effect prong, the Supreme Court has further identified three criteria to evaluate whether government aid has the effect of advancing religion: (a) whether the statute results in governmental indoctrination, (b) whether it defines its recipients by reference to religion, and (3) whether it creates an excessive governmental entanglement with religion.[9] *Agostini v. Felton*, 521 U.S. 203, 234 (1997); *Mitchell*, 530 U.S. at 808.

In *Mitchell*, the plurality noted that a key determination in assessing the constitutionality of government aid under a particular program or statute is the neutrality of the program at issue. *Mitchell*, 530 U.S. at 808 ("In distinguishing between indoctrination that is attributable to the

---

[8]As originally formulated, the *Lemon* test contained a third part, *i.e.*, an analysis whether the statute fostered an excessive government entanglement with religion.  *Lemon*, 473 U.S. at 382-83.  However, later recognizing that the third entanglement prong was an "aspect of the inquiry into the statute's effect," *Agostini v. Felton*, 521 U.S. 203, 233 (1997), the Supreme Court modified the *Lemon* test and "recast Lemon's entanglement inquiry as simply one criterion relevant to determining a statute's effect."  *Mitchell v. Helms*, 530 U.S. 793, 808 (2000) (referring to the *Lemon* test as the "purpose and effect test" as modified by the opinion in *Agostini*).

[9]When analyzing the Jamboree statute, the DOD urges this court to use the endorsement test in ascertaining whether the Jamboree statute violates the Establishment Clause.  "Under this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval'"of religion. *Freedom from Religion Foundation, Inc. v. Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000) (citation omitted).  Given that the analytical framework detailed in *Mitchell* is the Supreme Court's most recent pronouncement on the method of evaluating Establishment Clause cases, this court will analyze all of the challenged statutes and programs at issue under that framework.  The court notes that in *Mitchell*, Justice O'Connor indicated that she would conduct an analysis of whether a particular statute constituted government endorsement of religion using the three criteria under the *Lemon* test, 530 U.S. at 845 (O'Connor, J., concurring) (noting that the three "effect" criteria of the *Lemon* test could also be reviewed to determine whether the challenged aid constitutes an endorsement of religion) (citation omitted) and 867 (concluding that challenged statute did not violate Establishment Clause based on an analysis of the various *Lemon* criteria, and stating that "[f]or the same reasons, 'this carefully constrained program also cannot reasonably be viewed as an endorsement of religion.'").  Accordingly, the court will do the same here.

State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion.").  Justice O'Connor, in her concurring opinion in *Mitchell*, agreed that neutrality is "an important reason for upholding government-aid programs against Establishment Clause challenges."  *Mitchell*, 530 U.S. at 839.  However, she rejected the plurality's complete reliance on the neutrality of the program in determining whether the program complied with the Establishment Clause.  *Id*. (disagreeing that "a government-aid program passes constitutional muster solely because of the neutral criteria it employs as a basis for distributing aid.") (O'Connor, J., concurring).  In addition to neutrality, Justice O'Connor inquired whether actual diversion of government funds for a religious purpose had  taken place. *Mitchell*, 530 U.S. at 857 ("our decision in *Bowen* proves only that actual diversion, as opposed to mere divertibility, is constitutionally impermissible.") (O'Connor, J., concurring).  However, even if actual diversion has taken place, O'Connor found that such diversion may be constitutionally insignificant if it is *de minimus* or if safeguards against religious use that are employed by the program are constitutionally sufficient.  *Mitchell*, 530 U.S. at 867 (O'Connor, J., concurring).

"When determining whether an aid program has the primary effect of advancing religion, the Court asks whether a 'reasonable observer' would perceive an advancement of religion through government aid."  *Barnes-Wallace v. Boy Scouts of America*, 275 F. Supp. 2d 1259, 1270 (S.D. Cal. 2003) (citing *Mitchell*, 530 U.S. at 843) (other citation omitted); *see also Good News Club v. Milford Central School*, 533 U.S. 98, 119 (a reasonable observer is "deemed aware of the history and context of the community and forum" in which the challenge arises).

B.      *Pervasively sectarian test*

*1.     Background*

Prior to analyzing the challenged statutes and programs under the *Lemon* test, however, the court will first address plaintiff's argument that the BSA is pervasively sectarian, and thus, cannot receive any government aid. *See Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 755 (1976) ("no state aid at all [can] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones"). An institution is pervasively sectarian if a "substantial portion of its functions are subsumed in the religious mission." *Bowen v. Kendrick*, 487 U.S. 589, 610 (1988). "[D]irect aid is considered to have a 'principal or primary effect' of advancing religion if the aid goes to institutions that are 'pervasively sectarian.'" *Freedom from Religion Foundation v. Bugher*, 249 F.3d at 611-612 (citing *Bowen,* 487 U.S. at 610; *Hunt v. McNair*, 413 U.S. 734, 743 (1973)).

The continued vitality of the "pervasively sectarian" test has come into question after Justice Thomas recently commented in the plurality opinion in *Mitchell* that "nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this court bar it. This doctrine, born of bigotry, should be buried now." *Mitchell*, 530 U.S. at 829 (Thomas, J., plurality). Thus, despite the fact that the doctrine has not been officially overruled by the Supreme Court, at least one court has deemed it effectively overruled. *Barnes-Wallace,* 275 F. Supp. 2d at 1267-69 ("The Court ... concludes that the Supreme Court has effectively, if not explicitly, overruled use of the pervasively sectarian test.").[10] *See also Columbia Union College v. Oliver*, 254 F.3d 496, 504

---

[10]In *Barnes-Wallace*, the district court addressed plaintiffs' challenge to the city's leasing of public park land to a BSA regional council. The court found that the Boy Scouts were a religious organization, and held that because the city did not lease the land to the Boy Scouts by

(4th Cir. 2001) (stating that Justice O'Connor's concurrence in *Mitchell* "replaced the pervasively sectarian test with a principle of 'neutrality plus.'").

It is true that Justice Thomas rejected the pervasively sectarian test in *Mitchell*. However, Justice Thomas wrote for the plurality, not a majority, and the test was not expressly rejected by the full Court. This court remains bound by Supreme Court precedent that has not been overruled. *See Steele v. Indust. Dev. Bd. of Metro. Gov't Nashville*, 301 F.3d 401, 408-09 (agreeing with district court that it was bound by pre-*Mitchell* law as to the pervasively sectarian test and stating that "the Supreme Court has specifically stated that the lower courts are to treat its prior cases as controlling until the Supreme Court itself specifically overrules them.") (*citing Agostini v. Felton*, 521 U.S. at 237 (1997) (stating that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")). Accordingly, this court will consider plaintiffs' argument under the pervasively sectarian test.

### 2. The BSA is religious but not pervasively sectarian.

Courts have generally been faced with the pervasively sectarian inquiry in the context of

---

way of a religion-neutral process, but rather as the result of exclusive negotiations with the Boy Scouts, the lease violated the Establishment Clause. *Barnes-Wallace*, 275 F. Supp. 2d at 1273-74. Although the plaintiffs argued that the lease was invalid under the pervasively sectarian test, the court concluded that the test was no longer good law after the express rejection by the plurality in *Mitchell* as well as by Justice O'Connor's concurrence in *Mitchell* in which she distinguished direct and indirect aid and stated that "when government aid supports a school's religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, no reasonable observer is likely to draw from the facts . . . an inference that the State itself is endorsing a religious practice or belief." *Mitchell*, 530 U.S. at 843.

analyzing aid to colleges and have considered a variety of factors in determining whether an organization or institution is pervasively sectarian. These factors include whether the students were required to attend religious services, the level of the institution's affiliation with a particular church, whether classes are begun with mandatory prayer, whether faculty hiring or student admission decisions are based on that person's religion, and the content of the curriculum. *See Roemer,* 426 U.S. at 755-57 (district court found four Catholic colleges at issue were not pervasively sectarian based on the "high degree of institutional autonomy" from the Catholic church, attendance at Roman Catholic exercises on campus not required, religion or theology courses supplemented a broad liberal arts curriculum, practice of starting class with prayer was not required, and faculty hiring and student admissions decisions were for the most part not based on religion); *Tilton v. Richardson,* 403 U.S. 672 (1971) (in concluding that religiously affiliated private colleges were not pervasively sectarian noting that attendance at religious services not required, required theology courses were taught according to certain academic standards and were not limited to courses on Roman Catholicism, the schools introduced evidence that they made no attempt to indoctrinate students or proselytize, and that non-Catholics were admitted as students and hired as faculty); *Hunt v. McNair*, 413 U.S. 734, 743 and 746 (1973) (stating that college was not pervasively sectarian even though the college's board of trustees was elected by the South Carolina Baptist Convention, the approval of the Convention was required for certain financial transactions, and the charter of the College could be amended only by the Convention, but that there were no religious qualifications for faculty membership or student admission).

Plaintiffs point to the following factors in support of a finding that the Boy Scouts is a

religious and pervasively sectarian organization.

(1) The Scout Oath, which all Boy Scouts must know and subscribe to.

(2) The BSA Declaration of Religious Principle, quoted above.

(3) The BSA excludes atheists and agnostics from youth membership and adult leadership.

(4) The Scout Law, which provides that "a Scout is Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Brave, Clean, and Reverent."

(5) The BSA is theistic.

(6) The BSA describes the "duty to God" component of the Boy Scout Oath as "the bedrock of Scouting's values."

(7) The BSA encourages its youth members to practice their religious beliefs.

(8) The Scoutmaster Handbook states that "[T]he Boy Scouts of America is a nonsectarian organization advocating a devout belief in deity through the Scout Oath and law."

(9) The BSA encourages its youth members to practice their religious beliefs as directed by their parents and spiritual advisers.

(10) Nationally, more than 77,000 Packs, Troops, and Crews, or roughly 63% of all Packs, Troops, and Crews, are chartered to religious organizations. Nearly 1.7 million youth, or 56% of all youth in Scouting belong to Packs, Troops, and Crews chartered to religious organizations.

(11) Religious organizations have embraced the BSA because of its commitment to the traditional values found in the Scout Oath and Law, including the obligation to do one's duty to God.

(12) Completion of each rank in Boy Scouting requires the youth member to show that he is trying to live by the values of the Scout Oath and Law, which includes, among other things, doing one's duty to God and being reverent.

(13) To earn the Bear rank in Scouting, a boy must complete twelve achievements from four groups: one from God, three from Country, four from Family, and four from Self. In order to complete the God group, a boy must earn either the religious emblem of his faith or complete the series of activities called "Ways We Worship", which requires the boy to (a) name and discuss people who have shown great faith, (b) discuss with an adult how having faith and hope are important, (c) practice his faith as instructed by his family or religious leaders, and (d) make

a list of ways to practice his religion during a week and check them off as he completes them.

(14) To earn the Webelos rank in Scouting, a boy must complete a variety of civic, administrative and educational activities.  In addition, the boy must discuss his faith and either earn the religious emblem of his faith or do two of the following: (a) attend the church, synagogue, mosque, or other religious organization of his choice, talk with his fellow religious leaders about his beliefs, and tell his family and leader what he learned; (b) list and do two things that he thinks will help draw him nearer to God; (c) as directed by his family and religious group, pray to God or meditate reverently for at least one month, (e) under the direction of his religious leader, do an act of service for someone else and talk about it with his family and Den leader, or (f) list at least two ways he believes he has lived in accordance with his religious beliefs.

(15) To earn the First Class rank in Boy Scouting, a Boy Scout must, among numerous other civic, recreational and educational tasks, serve as the patrol cook, lead the patrol in saying grace and supervise cleanup.

(16) BSA youth members can earn the religious emblems of their faith.  The religious emblems program is an optional program and the religious instruction comes from the outside religious organization, not a Scouting leader.  Scouts who earn religious emblems wear a patch displaying a square knot over the left shirt pocket of their uniform, and wear an additional emblem on their uniforms during full uniform occasions.  Religious organizations design, develop, and award the emblems.  The BSA, through its Religious Relationships Committee, approves the process by which the religious emblems are awarded.

(17) Each year, more than 75,000 youth earn a religious emblem.  In 2001, roughly 81,000 youth earned a religious emblem.  On a percentage basis, 3.1% of Cub Scouts, 1.% of Boy Scouts, and 0.8% of Venturers earned a religious emblem.

(18) BSA Fact Sheet 02-503 states that "[t]he religious emblems program also is a large part of the personal growth method."

(19) The BSA monthly magazine, "Boys' Life" has included information on the religious emblems program and some have included half-page Bible stories among the other articles.

(20) A small number of Packs, Troops, and Crews have Scout chaplains.  When a troop chartered by a religious organization has a chaplain, it is customary that the chaplain come from within that organization rather than from another.  The BSA "Manual for Chaplain Aides and Chaplains" states that the chaplain is responsible for providing worship services, promoting the religious emblem program, helping to develop a reverent climate at camp, and helping campers and staff grow in their relationships with God and their fellow Scouts.

(21) A Chaplain aide is an approved BSA youth position in Troops, although most troops do not have a chaplain aide. According to the BSA "Manual for Chaplain Aides and Chaplains,"

a chaplain aide is responsible for working with the Troop chaplain to plan interfaith religious services during Troop outings, encouraging troop members to strengthen their own relationship with God through personal prayer and participation in religious activities, presenting an overview of the religious emblems program, and participating in troop planning meetings to ensure that a spiritual emphasis is included in Troop activities.

(22) The BSA publishes a "Boy Scout Songbook," which contains 137 songs. Of the 137 songs, five can be characterized as religious hymns or prayers. These five songs are: "Scout Leader's Prayer," A Boy Scout's Prayer," "Onward Christian Soldiers," "Come, Thou Almighty King," and "All Hail the Power of Jesus' Name."

(23) The BSA has printing facilities and has printed material developed and promulgated by religious chartered organizations for use with Scouts who are also members of those faiths. For example, in 1989 BSA printed "Woods Wisdom, Jewish Program Features" at the request of and for use by Jewish religious organizations as a companion to the general "Woods Wisdom" for adult leaders. The BSA also printed the "Scout is Reverent" booklet at the request of and for use by Protestant religious organizations.

(24) For the 2001 Jamboree, the BSA printed and promulgated a "Troop Leader Guide" which states that the "required personal camping equipment" for each youth attending the Jamboree included a prayer book. The Guide encouraged all participants to say grace at meals in a reverent manner, and suggested particular prayers for Protestants, Catholics and Jews.

(25) As part of the 2001 Jamboree, the BSA printed a 10-page booklet entitled "Duty to God: A Scout is Reverent." In the introduction, the booklet states that "[t]he daily devotional guide called 'Duty to God' was prepared for your personal use as well as for use as a spiritual guide for worship with your unit. As you travel from many directions to the jamboree, we encourage you to use this daily guide for spiritual reflection. All of us on the chaplaincy team are available to you." Each daily devotion includes a passage from the Bible, a "thought for the day," discussion questions (such as "What are some of the ways we can know that God exists here at the jamboree?"), a devotional prayer and an evening prayer.

(26) At the 2001 Jamboree, the BSA issued a commemorative Jamboree patch to the participants and allowed participants to earn additional patch segments to place around the perimeter of the Jamboree patch. To earn the "Duty to God" segment, Jamboree participants needed to attend a religious service, take part in at least three group prayer devotionals, visit the religious drop-in center and fill out an interest card, lead grace before a meal, and meet a chaplain. Neither this patch segment nor any of the others was mandatory.

(27) At the 2001 Jamboree, there were 110 chaplains present and the BSA estimated that 98% of the Jamboree participants would attend a religious service. Any Scout who attended a religious service did so voluntarily.

(28) At the 2001 Jamboree, the ambassador from the Vatican and the Archbishop of

Baltimore celebrated mass for Roman Catholic Scouts and visitors.

(29) At the 1997 Jamboree, there was a display of religious exhibits (among 195 other exhibits) that filled two tents, and a crafts program that assisted youth in making religious items.

While the BSA's descriptions of itself may not be determinative of whether the Boy Scouts is a religious or pervasively sectarian organization for purposes of an Establishment Clause challenge,[11] such descriptions are instructive. In a posting on the www.scouting.org website on January 14, 2004, (Pl. Exh. 6(FF)), the Boy Scouts state that "it is an organization with strong religious tenets" and that it "is committed to the proposition that no child can develop to his/her fullest potential without a spiritual element in his/her life." The posting also states that the BSA is not "merely a recreation or social organization that taught kids how to camp, and nice things about crafts, and getting along with their neighbors," and points to its "commitment to providing . . . faith-based values to [its] constituency."

Defendants argue against a finding that the BSA is either pervasively sectarian or religious by asserting that the BSA is a primarily secular organization "whose purpose is 'to promote . . . the ability of boys to do things for themselves and others, . . . [and] to teach them patriotism, courage, self-reliance, and kindred values.'" In support of their position, defendants contend that the Scout Oath is not a religious oath, that no religious activity is a mandatory part of Scouting and that the BSA merely encourages Scouts to privately exercise their religious faith as directed by their families and spiritual advisors. Defendants also assert that the religious

---

[11]Defendants consistently reiterate this proposition throughout their briefs and statements of fact, citing to *Powell v. Bunn*, 59 P.3d 559, 580 n. 32 (Or. Ct. App. 2002). This court agrees that "self-labeling" is not dispositive; however, in the appropriate circumstances, such evidence may be properly considered by the court in its determination of whether or not the BSA is a religious organization for purposes of this case.

emblem program is voluntary and that it is the religious organizations and not the BSA that design, develop and award the emblems, which are made available to other youth organizations and not just the BSA. According to defendants, the BSA only suggests graces and prayers to be used in certain situations and that the content of any prayers that are said is left up to the choice of those participating. According to defendants, many Scouts and troops do not engage in any religious activity and the BSA has no problem with that.

Defendants also state that the BSA is not controlled by organized religion simply by virtue of the fact that 63% of all BSA Packs, Troops and Crews are chartered to religious organizations. Defendants point to the fact that the BSA's National Executive Board is composed of individuals from all types of chartering organizations including civic, fraternal, educational, and religious and that those individuals from religious organizations who serve on the board do so in their individual capacities, and not as representatives of the religious organizations. Finally, defendants state that while the Jamboree contains religious aspects, these are not central to the purpose of the Jamboree and again, participation in any religious activity at the Jamboree is optional.

The court concludes that based on the evidence presented, the BSA is not pervasively sectarian. While the BSA "recognizes the religious element in the training of its members," it states that it encourages its youth members to practice their religious beliefs as directed by their parents and spiritual advisers. Scouts are not required to attend religious services or participate in grace. Importantly, secular non-religious activities are a substantial part of the Scouting experience. It is undisputed that the Boy Scouts exclude atheists and agnostics from its youth membership and adult leadership, and which this court finds weighs in favor of concluding that

the BSA is pervasively sectarian.  However, "[t]o answer the question whether an institution is so 'pervasively sectarian' that it may receive no direct state aid of any kind, it is necessary to paint a general picture of the institution composed of many elements."  *Roemer*, 426 U.S. at 758. Accordingly, no one element of the BSA organization is determinative as to whether it can be considered pervasively sectarian.  Based on a consideration of all the evidence presented to it, the court concludes that the BSA is not pervasively sectarian.  *See Columbia Union College*, 254 F.3d at 508 (affirming district court's conclusion that Columbia Union college was not pervasively sectarian even though the college had a mandatory worship policy for a minority of the students, the "Seventh-Day Adventist Church exerted a dominance over college affairs and . . . the college gave an express preference in hiring and admissions to members of the Church," because "these factors by themselves were not enough to make the college a pervasively sectarian one.")

However, based on consideration of the same evidence, the court finds that the BSA is religious for purposes of this Establishment Clause analysis.  *See Barnes-Wallace*, 275 F. Supp. 2d at 1268-69 (concluding on similar facts that the Boy Scouts is a religious organization); *Sherman v. Community Consol. Sch. Dist. 21*, 8 F.3d 1160, 1165-66 (7th Cir. 1993)(while not holding that the Boy Scouts is a religious organization, implying that it is by contrasting the BSA with "nonreligious" youth groups).

C.      *Lemon Test*

Having determined that the BSA is a religious but not pervasively sectarian organization, the court will now analyze the challenged statutes under the *Lemon* test described above.

1.      *Secular Legislative Purpose*

36

This court's first inquiry is whether the challenged statute or program has a secular purpose. Plaintiffs, however, do not argue that the statutes or programs at issue have an improper purpose. *See* Pl. Resp. to Defendants' Motion for Summary Judgment, at n.8 and n.15. Accordingly, the court will move on to the effect prong of the inquiry.

2.      *Principal or Primary Effect that Neither Advances nor Inhibits Religion*

As to the "effect" prong, the court must determine whether the Jamboree, IRT and National Guard statutes and the CDBG program have the primary effect of advancing or inhibiting religion. As noted above, the court generally will look to three criteria as a basis for this analysis: whether the program results in governmental indoctrination, defines its recipients by reference to religion, or creates an excessive entanglement between government and religion. *Agostini*, 521 U.S. at 234. Given that plaintiffs do not argue that the challenged statutes or program create an excessive entanglement, the court will focus on the first two criteria only.

A.      *Defines recipients by reference to religion*

Given the court's conclusion that the Boy Scout's is a religious organization, the court will address whether the challenged government aid has the principal or primary effect of advancing religion under the three *Lemon* "effect" criteria, the first of which is whether the aid defines its recipients by reference to religion. This criterion looks to the same set of facts as does the inquiry into governmental indoctrination inquiry discussed below, but to answer a different question–"whether the criteria for allocating the aid 'creat[e] a financial incentive to undertake religious indoctrination.'" *Mitchell*, 530 U.S. at 813 (citing *Agostini*, 521 U.S. at 231) (Thomas, J., plurality). In *Mitchell*, the court restated the test as initially laid out in *Agostini*:

> This incentive is not present, however, where the aid is allocated on the basis of

37

neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion.

*Id.* (citing *Agostini*, 521 U.S. at 231).

It is clear from the record that neither the IRT and National Guard statutes nor the HUD programs define their recipients by reference to religion because all of the aid provided under these statutes or programs is allocated on the basis of neutral secular criteria that neither favors nor disfavors religion and is made available to both religious and secular beneficiaries.

The Jamboree statute, however, presents a different situation. The statute contains no particular criteria on which the aid is allocated, neutral or otherwise. Congress simply has authorized the appropriation of a certain amount of funds to be used solely in support of the NSJ. Further, the aid is not available to both religious and secular beneficiaries; rather, the only beneficiary is the BSA. The concern about financial incentives is apparent and the risk exists that as a result, one could attribute to the government any indoctrination by the BSA.

B.      *Governmental indoctrination*

1.      *Jamboree statute*

The Jamboree statute provides aid that is in-kind in nature. As the *Mitchell* plurality noted, in determining whether government indoctrination has occurred, the court has looked to the neutrality of the statute, "upholding aid that is offered to a broad range of groups or persons without regard to their religion." *Mitchell*, 530 U.S. at 809-10 (Thomas, J., plurality) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient's conduct has been done at the behest of the government."). Justice Thomas went on to explain that "if the government,

seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, it is fair to say that any aid going to a religious recipient only has the effect of furthering that purpose." *Id.*

As a way of assuring neutrality, the Court considered whether the aid was indirect, that is whether it was the result of "the genuinely independent and private choices of individuals." *Id.* at 810. (Thomas, J., plurality). "If numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment." *Id. See also Freedom from Religion Foundation, Inc. v. McCallum*, 214 F. Supp. 2d 905, 915 (W.D. Wis. 2003) ("When a program receives indirect funding, it is the individual recipient, and not the state, who chooses to support the religious organization, reducing the likelihood that the public funding has the primary effect of advancing religion in violation of the establishment clause.").

The Jamboree statute is neither neutral nor is the aid it provides the result of the "genuinely independent and private choices of individuals." First, it is not offered to a broad range of groups; rather it is specifically targeted toward the Boy Scouts, which, as this court has already concluded, is a religious organization from which agnostics and atheists are excluded. Second, the aid is not based on the "independent and private choices of individuals." Rather, the aid is provided directly to the Boy Scouts pursuant to the singular choice of Congress to provide a significant amount of aid (almost $8 million in 2005) to the BSA Jamboree to the exclusion of other possible recipients. Given the Supreme Court's focus on neutrality in approving government aid to religious organizations and the Jamboree statute's complete lack of neutrality

in allocating aid, the court finds that a reasonable observer would conclude that the Jamboree statute conveys a message of endorsement of religion. As such, the court finds that the aid provided by the Jamboree statute violates the Establishment Clause. *Barnes-Wallace,* 275 F. Supp. 2d at 1276 (finding that lease provided to Boy Scouts for city park was not result of religion-neutral process and thus violated Establishment Clause).

2.       *IRT and National Guard statutes*

The IRT and National Guard statutes authorize direct in-kind aid to thirteen statutorily-designated youth and charitable organizations as well as other entities approved by the Secretary of Defense on a case-by-case basis. 10 U.S.C. § 2012 and 32 U.S.C. § 508. Nothing in the statutory language and no evidence put forth by the parties indicates that the thirteen specifically-identified entities were selected based on religious or non-secular criteria. Indeed, plaintiffs do not challenge these statutes on the ground that they are not neutral to religion.

The DOD seeks summary judgment on the ground that the IRT program is open to all and makes support available on religion-neutral criteria.[12] The DOD contends that because the aid provided under these statutes is in the form of secular, in-kind services (such as engineering or construction support), diversion to religious use is unlikely and any such diversion would be de *minimus.* Significantly, however, the DOD provides no evidentiary support whatsoever in support of this sweeping statement. Further, the DOD fails to discuss whether any adequate safeguards exist in order to prevent aid from being used for religious purposes. As noted above, in her concurrence in *Mitchell*, Justice O'Connor noted that neutrality, while important, is not the

_____

[12]Interestingly, the DOD does not address the constitutionality of the IRT and National Guard statutes in its reply brief. Accordingly, the court relies on the arguments by the DOD as to these two statutes in its opening brief.

only consideration in determining whether a statute results in governmental indoctrination. Accordingly, due to the lack of evidentiary support as to whether the aid is used for religious purposes and as to whether adequate safeguards exist to ensure that aid is not used for religious purposes, the court cannot make a determination as to whether the IRT and National Guard statutes result in governmental indoctrination.  Additional proceedings will be necessary to ascertain whether the IRT and National Guard statutes violate the Establishment Clause.  As such, the DOD's motion for summary judgment as to IRT and National Guard statutes is denied.

In their motion for summary judgment, plaintiffs entire challenge to the IRT and National Guard statutes is based on their contention that these two statutes (as well as the Jamboree and HUD grant programs) violate the "antidiscrimination" principle of the Establishment Clause. According to plaintiffs, all of the government aid at issue in this case is unconstitutional under the Establishment Clause for the sole reason that the Boy Scouts exclude agnostics and atheists. In essence, plaintiffs ask this court to fashion single-prong test in which the only inquiry as to whether a statute or program violates the Establishment Clause is whether it discriminates on the basis of religion.  No matter how attractive this court finds such a proposal, especially within the morass of our Establishment Clause jurisprudence, the court declines plaintiffs' invitation. *Mitchell*, 530 U.S. at 869 (Souter, J., dissenting) ("In all the years of its effort, the Court has isolated no single test of constitutional sufficiency" in analyzing whether government aid to religious organizations violates the Establishment Clause).  Thus, plaintiffs motion for summary judgment as to the IRT and National Guard statutes is denied.

3.	*CDBG program*

The grants made pursuant to the CDBG program are direct cash grants.[13]  "'[S]pecial Establishment Clause dangers' exist when money is given to religious schools or entities directly rather than . . . indirectly."  *Mitchell*, 530 U.S. at 818-19 (Thomas, J. plurality) (internal citations omitted) and 856 ("the most important reason for according special treatment to direct money grants is that this form of aid falls precariously close to the original object of the Establishment Clause's prohibition.") (O'Connor, J., concurring).  As such, unrestricted cash payments made directly to religious institutions are unconstitutional, whether or not they are pervasively sectarian.  *Freedom from Religion Foundation v. Bugher*, 55 F. Supp. 2d 962, 967 (7th Cir. 1999), *aff'd*, 249 F.3d 606 (7th Cir. 2001).  In *Roemer*, the Court held that the Establishment Clause permits direct state money grants to general secular educational programs of non-pervasively sectarian religious colleges where there is a statutory prohibition against sectarian use and an administrative enforcement of that prohibition.  *Roemer*, 426 U.S. at 759.  The key inquiry, then, with respect to the CDBG cash grants is whether they are sufficiently restricted as to religious use.

Courts have considered statutory bans against religious use, state monitoring on the use

---

[13] HUD does not contend that the BSA grants are the result of the "true private choice" of the recipients.  *See* Federal Defendants Joint Reply at 23.  However, HUD argues that private choice is relevant to the extent that "the choice to promise to do one's duty to God as a condition of joining the Boy Scouts is reasonably attributed to the boys who freely make it."  But this is presumably true of any religious organization that receives government funds.  Further, defendants contend that "the amount of HUD funding that a Boy Scout troop received was often tied to the troop's size, which is a direct function of the individual choices to join the troop."  *Id.* However, the evidence HUD cites in support of its assertion that the amount of funding depended on the size of the Boy Scout troop (HSUMF, at ¶¶ 39,75) fails to demonstrate this contention.  The cited material shows only that certain locations provided specified funds to the Boy Scouts and identifies the "number of persons assisted," but does not indicate any relationship between the grant amount and the number of persons aided.  Accordingly, the court finds that the cash grants made pursuant to the CDBG program are also direct aid.

of funds, and signed affidavits by recipients that funds would not be used for religious purposes to be adequate safeguards against religious use. *Mitchell*, 530 U.S. at 861-63 (O'Connor, J., concurring) (adequate safeguards included requirement that funds be used only for secular and neutral purposes, prohibition on religious use, requirement that aid only supplement and not supplant non-federal sources of aid, monitoring visits and random review of library books for religious content); *Roemer*, 426 U.S. at 739-43 (statutory prohibition against sectarian purposes, funds allocated based on students not participating in theological program, affidavit indicating funds not be used for sectarian purposes, year-end report listing use of funds, state funds subject to audit); *Hunt*, 413 U.S. at 736, 739-40, 744 (statute prohibited sectarian use, lease between college and state required that leased land not be used for sectarian purposes, provision allowing for inspections, and any reconveyance of land to college required restriction against use for sectarian use)*; Columbia Union College*, 254 F.3d at 506 (statutory prohibition against sectarian use, affidavit that funds not be used for sectarian purposes, aid allocated according to number of students *not* enrolled in theology programs, colleges with only a sectarian program prohibited from receiving any funds, funds are subject to audit and affidavits documenting intended and actual use of funds). Finally, as noted by Justice O'Connor in *Mitchell*, the safeguards need not be failsafe but only constitutionally sufficient. *Mitchell*, 530 U.S. at 861 (O'Connor, J., concurring) .

HUD contends that the following act as adequate safeguards:

(1) HUD regulations expressly prohibit the use of CDBG funds for inherently religious activities, such as worship, religious instruction, or proselytization. 24 C.F.R. § 570.200(j)(3)(iii)(2000); 24 C.F.R. § 570.200(j)(2).

(2) During the time of the challenged grant, primarily religious entities that received CDBG funds had to agree in writing that they would "provide no religious instruction or counseling, conduct no religious worship or services, engage in no religious proselytizing, and exert no other religious influence in the provision of [CDBG-funded] public services." 24 C.F.R. § 570.200(j)(3)(iii)(2000). However, as of October 2003, regulations promulgated by HUD repealed this requirement that sub-grantees certify that the government funds have not been used for religious purposes. *Compare* 24 C.F.R. § 570.200(j)(3)(iii) (2000) *with* 24 C.F.R. § 570.200(j) (2003).

(3) As part of the Consolidated Plan that a grantee must submit in order to receive funding, the grantee must make a number of certifications, including that it will comply with applicable laws. 42 U.S.C. § 5304(b); 24 C.F.R. §§ 570.303 and 91.224(b)(6),(8).

(4) There is a system in place for HUD to monitor CDBG grantee performance to ensure compliance with program regulations, including the prohibition on the use of CDBG funds for inherently religious activities. HSUMF at ¶ 37 (citing 24 C.F.R. §§ 570.901, 910-13). This system includes recordkeeping and reporting requirements. Specifically, CDBG grantees are required to annually review and report their progress on funded activities. 24 C.F.R. §91.520.

(5) There are sanctions for noncompliance with program regulations, including the prohibition on the use of CDBG funds for inherently religious activities. *See* id. (citing 24 C.F.R. §§ 570.911-13).

While the court acknowledges that the safeguards at issue here are not particularly detailed, the court finds that the safeguards presented here are constitutionally adequate. As

noted above, there must be a statutory prohibition against sectarian use and an administrative enforcement of that prohibition.  The court finds the spirit of these requirements satisfied here.

The court is not persuaded by plaintiffs arguments that "there are no adequate safeguards to ensure that the BSA does not use its HUD grants for religious purposes."  Plaintiffs' first argument that the safeguards are inadequate because no *statutory* ban on the use of funds for religious purposes exists and citation to *Bugher,* 249 F.3d at 613, in support are inapposite.  In *Bugher*, the court held that a letter accompanying cash grants distributions which stated only how the funds were to be used but did not prohibit religious use, did not constitute an adequate restriction since there was "no authority in the statute for such a limitation, nor was there any penalty for failure to comply."  *Id*. at 613.  Here, contrary to the letter in *Bugher*, violations of the Federal Regulations have express legal consequences.  *See* 24 C.F.R. § 570.911-13.  Plaintiffs point to no evidence indicating that a ban promulgated in the Federal Regulations is any less effective than one included in the statute itself.

Plaintiffs also contend that there is "no requirement that private sub-grantees certify in writing that they will not use funds for religious purposes and no monitoring system regarding religious use."  This is currently a true statement given that the regulations were amended in 2003 and such written requirement was repealed at that time.  However, the Supreme Court has not held that such written certifications are constitutionally mandated.

Plaintiffs argue that the inadequacy of the safeguards is demonstrated by the fact that HUD has "turned a blind eye to the BSA's open and notorious violation of HUD's own rules."  Specifically, Plaintiffs argue that HUD knew or should have known that a CDBG sub-grant from Pomona to BSA's "Adventure Mountain" project discriminated against atheists and agnostics

because the BSA required a religious affirmation from employees at the project.  Plaintiffs

contend that HUD did nothing despite being made aware of this fact.  As noted by defendants,

the statutory ban on discrimination under 42 U.S.C. § 5309(a) is separate and distinct from the

constitutional requirement that no funds be used for religious purposes.  In any event, the facts

show that HUD sent a letter to Pomona stating their concerns and that Pomona indeed ceased

funding that project.  Accordingly, plaintiffs argument on this ground fails.

Finally, Plaintiffs assert that "the HUD safeguards are inadequate as to the BSA, because

the BSA erroneously believes that it is legally entitled to violate non-discrimination clauses of

CDBG sub-grant agreements."  PR at 33.  In support of this contention, plaintiffs cite to a federal

False Claims Act lawsuit in which the "BSA denied that it had 'agreed to comply' with the anti-

discrimination clauses of the CDBG sub-grant agreement, even though the agreement clearly

contains such clauses."  *Id*.  We agree with defendants that the BSA's position in an unrelated

case in a different jurisdiction involving different legal claims and different parties cannot be

used to show inadequate safeguards in the instant case.  In any event, the safeguards need only

be constitutionally sufficient not failsafe.

The court's conclusion that sufficient restrictions on religious use exist is bolstered by the

fact that plaintiffs have failed to show that CDBG funds were used for religious purposes, or, if

any were used, that they were more than *de minimus*.  According to plaintiffs, hundreds of

thousands of dollars of CDBG funds were used for religious purposes.  For example, plaintiffs

contend that "[e]very HUD dollar received by the BSA is used to administer and support

programs in which the gathered youth (a) on threat of expulsion, must regularly and publicly

swear an oath of duty to God, and (b) must do their duty to God to advance in any rank."

Essentially, plaintiffs argue that all government aid that goes to the BSA is inherently unconstitutional because the BSA is a religious organization. However, this is not the state of the law. *Hunt,* 413 U.S. at 742 ("the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected"). Plaintiffs must show actual religious use by the Boy Scouts of the CDBG funds it has received. Accordingly, this argument, along with similar arguments made by plaintiffs with respect to Scoutreach, summer camps, and the values clarification program fails.

Plaintiffs, however, do attempt to point to actual religious use of CDBG funds. For example:

### a) Religious literature

According to plaintiffs, "[t]he BSA receives thousands of HUD dollars for BSA literature, including youth handbooks and magazine subscriptions. BSA youth handbooks state the Scout Oath of duty to God. Similarly, the BSA's monthly magazine regularly includes bible stories, and encourages youth to earn the religious emblems of their faith. Even the BSA's Songbook contains religious hymn and prayers such as "All Hail the Power of Jesus' Name." Plaintiff's then point to their statement of fact, ¶191, in which they list CDBG grants to certain cities or counties.[14] In turn, ¶191 refers to Plaintiffs' Exhibit 64 (CDBG IDIS report)[15] as well as

---

[14]In their statement of fact, plaintiffs list cities or counties that it contends used funds for religious literature with the CDBG grant amounts they received. However, when the court cross-references the amounts in the statement of fact with the actual IDIS report, it is not immediately apparent to which entries plaintiffs are referring. The court reminds counsel that it is not the court's job to sift through plaintiffs' exhibits to determine which facts support its claims.

[15]The HUD Secretary at the time, Mel Martinez, filed a sworn stipulation (Pl. Exh. 65) describing Exhibit 64 as reports generated by HUD's Integrated Disbursement Information System ("IDIS"). Then-Secretary Martinez's stipulation states that

       IDIS is a real-time, mainframe-based computer application that allows users to

Plaintiff's Exhibits 56 and 67 (plaintiff's FRE 1006 summaries of CDBG and PHDEP grants)[16] in support.

Taking each one separately, the court finds the following relevant portion of the description for each of the grants listed: St. Petersburg, Florida ("literature"); Madison County, Illinois ("texts"); Rock Island, Illinois ("handbooks and magazine subscriptions"); East Chicago, Indiana ("materials"); Gary, Indiana ("program materials"); Bossier City, Louisiana ("materials"); Reno, Nevada (no CDBG funds provided); Columbus, Ohio ("materials"); Charleston County ("materials"); Harlingen, Texas ("handbooks").

As an initial matter, the court notes that no "songbooks" are mentioned. Further, the general description of "materials," "texts" and "program materials" are insufficient to demonstrate use of CDBG funds for religious purposes. As for the "magazine subscriptions," plaintiffs apparently contend that these are for subscriptions to "Boys Life," which on occasion

---

enter, maintain and report on projects and activities that support HUD's Community Planning and Development formula grant programs, including the Community Development Block Grant ("CDBG") program. IDIS users include CDBG grantees, HUD's regional field offices, and HUD's headquarters staff. . . . IDIS allows CDBG grantees to provide HUD with performance results related to their Consolidated Plans and Annual Action Plans. Because information on program accomplishments and beneficiaries is important for HUD's annual report to Congress, information in IDIS must be accurate timely and complete. Through the end-of-year reporting process, grantees must ensure that all activity information in IDIS is up-to-date as of the last day of their program year. . . . The information contained in HUD389-94 and HUD780-86 was submitted by the CDBG grantees identified therein, pursuant to their duty to accurately and completely report activity information. These reports were generated by searching the activity description field for the term "Boy Scouts."

Then-Secretary Martinez also stipulated to the authenticity and accuracy of the reports.

[16]Because this section of the court's opinion considers only CDBG funds (because it has determined that plaintiffs do not have standing to challenge the PHDEP program), plaintiff's Exhibit 67 (PHDEP summary) will not be considered here.

contain pieces entitled "Bible Stories." The handbooks all contain the Scout Oath and Law. Further, the Scout Leader Handbook contains a section entitled "Duty to God," the Bears handbook contains a section called "Ways We Worship", and the handbooks all contain sections on how to earn the religious emblems. Because handbooks and magazine subscriptions are the only items in this section that could be identified as religious, the court will look only to the grants to Rock Island, Illinois and Harlingen, Texas.

The grants which included handbooks or magazines subscriptions to Rock Island, Illinois were $3,059 ($1,059 in 1997 and $2,000 in 2000) and $5,600 in 1998 to Harlingen, Texas. The court notes, however, that the descriptions on how the CDBG funds were used include items other than the handbooks and magazine subscriptions; thus, it is not clear how much of the aforementioned amounts were actually used for the handbooks and magazine subscriptions. In any event, even if all of the funds were used for handbooks and magazine subscriptions and even if these publications were deemed to be religious, such use would be *de minimus.* The total amount of CDBG grants made to the Boy Scouts from 1997 to 2003 was $1,946,954[17]; thus, approximately $8,600 arguably used for religious purposes would constitute only .44% of the total funds allocated to the Boy Scouts, which is *de minimus. Mitchell*, 530 U.S. at 865-67 (O'Connor, J., concurring) (concluding that "while extensive violations might require a remedy along the lines asked for by respondents," the presence of only a few examples of violations over four years, including the purchase of 191 religious library books through the challenged aid program representing less than 1% of the total allocation of aid through the program, was *de minimus*).

---

[17]HUD responds that the amount was only $1,739,878.00 but states that the discrepancy is immaterial and this court agrees. (D. Resp. to PSMF 174).

According to plaintiffs, "[t]he BSA receives tens of thousands of HUD dollars for adult leader salaries, and thousands of additional HUD dollars for youth membership fees. The membership rules for adult leaders and youth members are deeply religious; atheists and agnostics are excluded, and all others must swear an oath of duty to God." As with their contention regarding "religious literature," plaintiffs point to actual grants to cities and counties in support of their assertion that government funds are being unconstitutionally diverted to adult leader salaries and youth membership fees.

With respect to the adult leader salaries, plaintiffs' evidence does not support its assertions. Plaintiffs point to the following IDIS report entries: Mobile, Alabama ($146,250); Jacksonville, Florida ($266,560); Madison County, Illinois ($46,626); Pittsburgh ($18,491). The Mobile, Alabama funds were used only for PHDEP and not CDBG grants. As for the Jacksonville, Florida CDBG grants, it is unclear exactly which grants plaintiffs refer to, but the only Jacksonville grants to which plaintiff could be referring state that the funds will be used for "administrative and activity costs." The only possible entry for CDBG funds for Madison County, Illinois which plaintiffs could be referring to is "one full-time professional staff person." No CDBG grants were made to Pittsburgh. None of these descriptions indicate that funds were expended for adult leader salaries. Because plaintiffs have failed to point to any evidence in support of their contention that CDBG funds were used for adult leader salaries, the court need not decide whether such diversion would constitute religious use.

As for the youth membership fees, plaintiffs point to several grants to various cities where funds were provided to the Boy Scouts for "registration" fees, including Waycross,

Georgia ($10,000); Madison County, Illinois ($46,626); Rock Island, Illinois ($6,171); Gary, Indiana ($20,160); Hammond, Indiana ($10,000); Bossier City, Louisiana ($25,650); Reno, Nevada ($5,295); Atlantic City, New Jersey ($8,000); Columbus, Ohio ($46,250); and Arlington, Texas ($5,000). Again, the court notes that it is sometimes difficult to determine which grants plaintiffs refer to because some cities have made multiple grants over several years and plaintiffs do not specifically identify the grants to which they are referring. Further, the description of how funds were used does not lead to the conclusion that all the funds referred to by plaintiffs were used for registration fees, if at all. For instance, as to Hammond, Indiana, the description states that funds were used to "establish Cub and Boy Scout chapters," but does not refer to youth membership or registration fees. Additionally, the description for the Camden, New Jersey grants states they were provided to "initiate Boy Scouts." Further, the description for Columbus, Ohio states that funds were provided for "uniforms, registration fees, camp fees and materials" without identifying how much was allocated to each category. Thus, even if the court concluded that the youth membership fees constituted religious use, it is not clear what actual amounts were used for that purpose. Fianlly, the court notes that no CDBG funds were distributed to the Boy Scouts by Waycross, Georgia or Reno, Nevada. In any event, as with the literature, the court concludes that any amounts that went to youth membership fees were *de minimus*.

c) <u>Religious emblems on uniforms</u>

According to plaintiffs, "[t]he BSA receives thousands of HUD dollars for BSA uniforms. With the active encouragement of the BSA, hundreds of thousands of BSA youth members earn the religious emblem of their faith from their church and wear it on their

uniform."

All of the IDIS report listings referred to by plaintiffs make reference only to "uniforms" and not religious emblems on uniforms. Because plaintiffs have failed to point to any evidence that supports their contention that CDBG funds were used for religious emblems, this contention fails.

### d) Religious charter renewals

According to plaintiffs, "The BSA receives thousands of HUD dollars for charter renewals. The chartered organization must annually certify in writing, on threat of charter revocation, that all registered adult members subscribe to the BSA's Declaration of Religious Principle." Once again, however, the evidence cited by plaintiffs does not support this contention. Plaintiffs refer to ¶200 of their statement of fact, which states that "tens of thousands of dollars of HUD funds [were] earmarked for purposes including charter renewal fees." Plaintiffs then list the following recipients and amounts: Columbus, Georgia ($4,872); Hammond, Indiana ($10,000); Reno, Nevada ($4,134); Atlantic City, New Jersey ($10,000). However, upon review of the CDBG reports (not including the PHDEP report), none of the grants show money was used for charter renewal fees–Columbus, Georgia is not on the CDBG report at all; the Hammond, Indiana entry simply states that funds were used to "establish Cub and Boy Scout chapters"; no CDBG funds went to Reno, Nevada and none of the Atlantic City, New Jersey entries provide for charter renewals or anything like charter renewals. Accordingly, the court concludes that plaintiffs have failed to put forth sufficient evidence to show that government funds were used for charter renewal fees.

In conclusion, this court finds that the aid provided to the BSA under the CDBG program

does not violate the Establishment Clause.

## V.      Conclusion

For the reasons stated above, the cross-motions for summary judgment [175, 176, 180] are granted in part and denied in part.  Specifically, this court: (1) grants plaintiffs' motion for summary judgment as to the Jamboree statute; (2) grants defendant DOD's motion for summary judgment as to the Overseas statute lack of standing grounds; (2) denies plaintiffs' and defendant DOD's cross-motions for summary judgment as to the IRT and National Guard statutes; (4) grants HUD's motion for summary judgment as to the CDBG program on Establishment Clause grounds, and; (5) grants HUD's motion for summary judgment as to the PHDEP program on lack of standing grounds.


/s/ Blanche M. Manning
**Blanche M. Manning**
**United States District Judge**


DATE: March 16, 2005